UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NATHAN RYAN MENDEZ, JOE ADOLPH MENDEZ, AND ERIKA JEANETTE GUARDADO,<br><br>Defendants. | 5:21-CR-50024-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant Joe Mendez's Motion to Suppress (Doc. 68). Defendants Erika Guardado and Nathan Mendez filed motions to join in Defendant Joe Mendez's Motion to Suppress (Docs. 70, 72). A hearing was held on Thursday, August 5, 2021. Defendant Joe Mendez was personally present and represented by his attorney of record, Jonathan McCoy; Defendant Erika Guardado was present via video and represented by her attorney of record, Terry Pechota, who was personally present; Defendant Nathan Mendez was also present via video and was represented by his attorney of record, Jennifer Albertson, who was personally present. The Government was represented by the Assistant United States Attorney Gina Nelson. Three witnesses testified at the hearing, and four exhibits were received into evidence. Also, a live interpreter was present. Supplemental briefing concluded on October 13, 2021. Based on a careful consideration of all the evidence, and

counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant Joe Mendez's Motion to Suppress (Doc. 68) be denied.

## JURISDICTION

Defendants are charged in the Indictment with Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A). (Doc. 44). The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and United States District Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

On January 31, 2021, at approximately 4:15 p.m., South Dakota Highway Patrol Troopers Brandon Hansen, Stewart Griffith, and Tyler Jackson were stationary in a field approach facing west near mile marker 8 on Highway 18 west of Edgemont, Fall River County, South Dakota. (Doc. 88 at pp. 8-11). Each trooper was in their own patrol vehicle. (Doc. 88 at pp. 9-10). The South Dakota Highway Patrol targets certain roads that enter South Dakota where troopers see many vehicles traveling with illegal substances, Highway 18 is one of those roads. (Doc. 88 at pp. 9, 156).

Trooper Hansen observed a Chevy Silverado pickup truck with California license plates driving toward him. (Doc. 88 at p. 11). He observed that the Silverado was extremely clean, like it had been washed recently, which he

2

believed to be unusual because most vehicles in the wintertime have road grime on them. (Doc. 88 at pp. 11-12). He observed two occupants in the Silverado, both of whom continued to look straight ahead and did not look over at the three patrol cars as they passed by. (Doc. 88 at p. 12). Trooper Hansen observed that the Silverado appeared to be going above the posted speed limit of 65 miles per hour, so he used his rear radar to determine the Silverado's speed. (Doc. 88 at p. 13). The radar gave a reading of 70 miles per hour and locked the Silverado's speed at 69 miles per hour. (Doc. 88 at p. 13). At that point, Trooper Hansen pulled on the road and began to catch up with the Silverado to initiate a traffic stop. (Doc. 88 at p. 13). Prior to initiating the traffic stop, Trooper Hansen checked the Silverado's speed again, this time with his front radar, getting a reading of 68 miles per hour. (Doc. 88 at p. 13). Trooper Hansen activated his lights and pulled the Silverado over. (Doc. 88 at p. 13) (Ex. 1).

Trooper Hansen approached the passenger side of the Silverado and explained the reason for the stop (speeding). (Doc. 88 at p. 14) (Ex. 1). The driver identified herself as Erika Guardado and presented a California driver's license. (Doc. 88 at p. 15). The front passenger was identified as Nathan Mendez and the rear passenger as Joe Mendez. (Doc. 88 at p. 16). The occupants advised Trooper Hansen that the Silverado was a rental and provided him with a rental agreement from Hertz. (Doc. 88 at p. 15). Trooper Hansen explained to Ms. Guardado that he would be issuing her a written warning for the speed violation. (Doc. 88 at p. 17) (Ex. 1). At this point,

Trooper Hansen made some observations of the Silverado. (Doc. 88 at p. 18). First, the bed of the Silverado was completely empty. (Doc. 88 at p. 18). This was unusual to Trooper Hansen because trucks are less fuel efficient, so most people rent trucks to haul or utilize the bed of the pickup. (Doc. 88 at p. 18). Next, Trooper Hansen noticed that there were two items secured to the windshield – one was a cell phone and the other was a GPS-type device, both of which had a map on the screen. (Doc. 88 at pp. 18-19). This was unusual to Trooper Hansen because it is uncommon for multiple devices to track a location. (Doc. 88 at p. 19). Next, the inside of the Silverado was extremely dirty compared to the outside, as there was trash thrown all over and it looked like they had driven a long distance and spent significant time in the Silverado. (Doc. 88 at p. 19). Lastly, there were two smaller duffel bags in the back seat, a Walmart bag with clothing items, and a shoebox. (Doc. 88 at p. 19). Trooper Hansen would later learn that this was a minimal amount of luggage for the length of their trip. (Doc. 88 at p. 19).

Trooper Hansen also made some observations of the occupants of the Silverado. (Doc. 88 at p. 20). Ms. Guardado was extremely nervous, even after Trooper Hansen told her he would only be issuing her a warning. (Doc. 88 at pp. 17-18). Nathan Mendez was extremely nervous, he avoided eye contact at all costs and instead stared straight ahead out of the window, even though Trooper Hansen was standing right next to him at the passenger window. (Doc. 88 at p. 20). Joe Mendez also avoided eye contact and had a marijuana leaf tattoo on his forearm. (Doc. 88 at p. 20).

4

Trooper Hansen asked Ms. Guardado to accompany him to his patrol car. (Doc. 88 at p. 20). While in the patrol car with Ms. Guardado, Trooper Hansen ran a records check on her and asked about her travel plans. (Doc. 88 at pp. 21-22) (Ex. 1). She advised that they had come from California and were going to see Mt. Rushmore. (Doc. 88 at p. 22) (Ex. 1). She explained she had always wanted to see Mt. Rushmore so they were driving straight from California to Mt. Rushmore and then back home to California. (Doc. 88 at p. 23) (Ex. 1).

Trooper Hansen also looked at the rental agreement from Hertz that had been provided to him. (Doc. 88 at p. 24). The agreement was for approximately one month prior and listed another individual's name. (Doc. 88 at p. 24). Trooper Hansen found this very suspicious because based on his experience, a rental company as large as Hertz does not give its customers old rental agreements nor does it give its customers rental agreements under another person's name. (Doc. 88 at p. 24). Ms. Guardado stated that was what the rental company had given her, and that the Silverado was due back to the rental company the following Sunday in California. (Doc. 88 at p. 24-25) (Ex. 1).

Meanwhile, Troopers Griffith and Jackson arrived on scene. (Doc. 88 at pp. 25-26) (Ex. 2, 3). Trooper Hansen left Ms. Guardado in his patrol car while he went back to the Silverado and asked Joe Mendez[1] to look for the correct

---

[1] Ms. Guardado advised Trooper Hansen that Joe Mendez was her husband. (Doc. 88 at p. 31) (Ex. 1).

rental agreement. (Doc. 88 at p. 26) (Ex. 1). Trooper Griffith stayed by the Silverado while Joe Mendez looked for the correct rental agreement and Trooper Hansen went back to his patrol car to re-join Ms. Guardado. (Doc. 88 at pp. 26-27) (Ex. 1). Trooper Jackson stood by Trooper Hansen's patrol car. (Doc. 88 at p. 27) (Ex. 1). Trooper Hansen asked Ms. Guardado more questions about their trip. (Doc. 88 at p. 28) (Ex. 1). Ms. Guardado was unsure where they were going to stay, saying they were going to figure it out when they got there, and mentioned possibly staying in Custer. (Doc. 88 at p. 27) (Ex. 1). This was suspicious to Trooper Hansen because from his experience, many hotels in Custer are not open during the wintertime. (Doc. 88 at p. 36).

Joe and Nathan Mendez located the current rental agreement, they provided it to Trooper Griffith, then Trooper Griffith provided it to Trooper Hansen. (Doc. 88 at p. 110) (Ex. 1). The correct rental agreement stated that the Silverado was due back in California in two days (on February 2, 2021). (Doc. 88 at p. 27). This was contrary to what Ms. Guardado said about the Silverado being due back the following Sunday. (Doc. 88 at p. 29). During this conversation with Ms. Guardado, Trooper Hansen noticed that she was extremely nervous. (Doc. 88 at p. 28). Trooper Hansen could see the artery on the side of her neck pounding, noticed she was breathing extremely heavy, and she looked at the Silverado and avoided eye contact with him. (Doc. 88 at p. 28). Trooper Hansen noted that several of Ms. Guardado's answers were very hesitant, such as she was unsure what day they left California, whether it was Tuesday or Wednesday (the rental agreement stated that the Silverado was

6

rented on Tuesday), and what had caused their delay in leaving California (she said it was both rain and snow).  (Doc. 88 at pp. 28-29) (Ex. 1).

As Trooper Hansen was still working on Ms. Guardado's written warning, he observed Trooper Griffith getting handed a container, which was then set on the hood of his patrol car by Trooper Jackson.  (Doc. 88 at pp. 30, 158) (Ex. 1). Trooper Hansen could see that it contained what appeared to be marijuana. (Doc. 88 at p. 30).  A hashish oil vaporizer was also placed on the hood of his patrol car.  (Doc. 88 at p. 30) (Ex. 1).  After seeing the small jar of marijuana and hashish oil vaporizer, Trooper Hansen asked Ms. Guardado if there were any other illegal drugs in the Silverado.  (Doc. 88 at p. 30) (Ex. 1).  She advised that everything was on the hood of his car.  (Doc. 88 at p. 31) (Ex. 1).  Trooper Hansen noticed that Ms. Guardado's nervousness was still present.  (Doc. 88 at p. 31).

While Trooper Hansen was in his patrol vehicle with Ms. Guardado, Trooper Griffith spoke with Joe and Nathan Mendez and inquired about their trip.  (Doc. 88 at pp. 109-111) (Ex. 2).  They told him that they were going to Mt. Rushmore for a family trip.  (Doc. 88 at p. 112).  Trooper Griffith also reviewed the rental agreement before providing it to Trooper Hansen; he noticed the Silverado was due back in California in two days and that it had been rented on January 26, 2021, so he inquired as to why they had rented the Silverado so many days before.  (Doc. 88 at pp. 110, 112).  Trooper Griffith asked them when they had left California.  (Doc. 88 at p. 112).  They gave a couple of different answers (one was Wednesday and one was Thursday).  (Doc.

88 at p. 112).  They also advised that they had spent over a day in California prior to leaving, which Trooper Griffith thought was suspicious.  (Doc. 88 at p. 112) (Ex. 1).  Joe Mendez advised that they had gotten stuck in a snowstorm near Colfax, California.  (Doc. 88 at pp. 112-113) (Ex. 1).

Trooper Griffith advised Joe and Nathan Mendez that part of his job is to talk to people about drugs.  (Doc. 88 at p. 113) (Ex. 2).  He spoke to them about personal use marijuana and how if they had some, it would not be that big of a deal, but they would likely only get a ticket.  (Doc. 88 at pp. 113-114) (Ex. 2).  Joe Mendez advised that he had some marijuana.  (Doc. 88 at pp. 114-115) (Ex. 2).  He handed a very small amount of marijuana in a jar to Trooper Griffith, along with a hashish oil vaporizer.  (Doc. 88 at p. 115).  Joe Mendez retrieved these items from a bag on the seat next to him.  (Doc. 88 at p. 115).  Trooper Griffith handed the items to Trooper Jackson who then put them on the hood of Trooper Hansen's patrol car.  (Ex. 1).

The three troopers decided to search the Silverado.  (Doc. 88 at pp. 32, 117).  They searched the cab area first.  (Doc. 88 at p. 117).  In the center console, Trooper Griffith found a depiction of St. Jude (the patron saint of lost causes).  (Doc. 88 at p. 117).  Based on Trooper Griffith's training and experience, St. Jude is often carried by people involved in smuggling narcotics, large amounts of money, and human trafficking.  (Doc. 88 at p. 117).  The troopers completed their search of the cab of the Silverado and did not find anything illegal.  (Doc. 88 at p. 118).

8

Trooper Griffith then looked around the outside of the Silverado looking for the voids inside the Silverado (such as inside the tailgate, inside the doors, inside the spare tire, inside the fuel tank, or other areas where contraband can be concealed). (Doc. 88 at pp. 118-119). Based on Trooper Griffith's experience, there are a few ways to access a truck's fuel tank, by removing the tank itself from under the vehicle, and by removing the bed of the truck. (Doc. 88 at pp. 119-120). Trooper Griffith crawled underneath the Silverado to check on the access points to the gas tank. (Doc. 88 at pp. 119-120). He noticed that some of the bolts had tooling marks. (Doc. 88 at pp. 119-120). He took a picture of the top of the fuel tank. (Doc. 88 at pp. 120, 130). He noticed inconsistencies on the fuel sending unit. (Doc. 88 at p. 120). Based on his experience, if contraband is put in a fuel tank, the fuel sending unit would have to be removed so if the sending unit has been messed with, there are usually inconsistencies in how clean or dirty it is. (Doc. 88 at p. 120). Trooper Griffith noticed that part of the tank was very dirty, and the other part was clean. (Doc. 88 at p. 120). He also noticed heavy tooling to bolts holding the truck bed to the truck frame. (Doc. 88 at p. 120). Trooper Hansen also noticed the bed of the truck had a black plastic bed liner, and that there were some different colored screws screwed into the bed liner in addition to the factory screws. (Doc. 88 at p. 32). This was suspicious to Trooper Hansen because rental vehicles typically do not have bed liners and if they do, they do not typically use aftermarket screws that do not match the color of the bed liner. (Doc. 88 at p. 32). Based on these observations, the troopers were suspicious

9

that this meant some sort of tampering with the Silverado and were concerned

that the gas tank contained contraband. (Doc. 88 at pp. 32, 121).

The troopers moved the Silverado to the nearby Edgemont Fire

Department due to it getting dark and cold outside, and so they could remove

the bed of the pickup in a safe location. (Doc. 88 at pp. 34, 121). At this point,

Trooper Griffith noticed that one of the bolts of the bed was missing. (Doc. 88

at p. 121). Trooper Griffith then removed the bed of the Silverado. (Doc. 88 at

p. 121). They discovered approximately forty pounds of methamphetamine

concealed in the fuel tank. (Doc. 88 at pp. 121-122, 163).

## DISCUSSION

Joe Mendez filed the present Motion to Suppress in which he argues, the

stop and seizure of the Silverado, based solely on a minor traffic violation

without probable cause, was invalid; there was no probable cause to search the

Silverado; and the stop exceeded the lawful duration and violated the Fourth

Amendment. (Doc. 69). Joe Mendez seeks to suppress evidence from the stop,

seizure and search of the Silverado and any statements made by Defendants.

(Doc. 68). Ms. Guardado and Nathan Mendez filed motions to join Joe

Mendez's Motion to Suppress. (Docs. 70, 72).

The Government opposes Joe Mendez's Motion to Suppress, responding

that Joe and Nathan Mendez lack standing to contest the search of the

Silverado as they were passengers in the Silverado with no reasonable

expectation of privacy in the Silverado, and because the stop was not extended;

that Trooper Hansen had probable cause to conduct a traffic stop as Ms.

10

Guardado was speeding, which speed was twice verified by Trooper Hansen's radar; that Trooper Hansen did not extend the stop as the further investigation was a permissible extension of the traffic stop because the written warning had not been completed and since Trooper Hansen became aware of numerous statements, strange behavior and inconsistencies that constituted reasonable suspicion to justify further detention of the Silverado's occupants; and the troopers had probable cause to the search the Silverado due to Joe Mendez's admission to having marijuana in the Silverado and handed Trooper Griffith marijuana and a hashish oil vaporizer, but also had probable cause to support the search from other observations (in the empty bed of the Silverado there were tooling marks, a bedliner with screws that were different from factory screws and were unusual on a rental Silverado, and underneath the Silverado there were tooling marks around the fuel tank which they knew from experience is commonly used for smuggling narcotics).  (Docs. 78, 93).

## I.    Whether Joe Mendez and Nathan Mendez Have Standing to Challenge the Search of the Silverado

"Fourth Amendment rights are personal and may not be asserted vicariously."  United States v. Trejo, 135 F. Supp. 3d 1023, 1030 (citing Rakas v. Illinois, 439 U.S. 128, 133-34 (1978).  A defendant challenging a search has the burden to establish "that [he] personally has an expectation of privacy in the place searched, and that [his] expectation of privacy is reasonable . . . ."  Minnesota v. Carter, 525 U.S. 83, 88 (1998).  The challenger must prove that the expectation of privacy is subjectively reasonable and objectively reasonable, "that is, one that society is willing to accept."  United States v. McCaster, 193

11

F.3d 930, 933 (1999).  "Generally, a mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'"  United States v. Anguiano, 795 F.3d 873, 878 (8th Cir. 2015) (quoting Rakas v. Illinois, 439 U.S. 128, 148 (1978)).

> Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994) (internal citation omitted).

"The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched."  United States v. Maxwell, 778 F.3d 719, 732 (8th Cir. 2015) (quoting Gomez, 16 F.3d at 256)). The defendant must "present evidence of his standing, or at least point to specific evidence in the record which the government presented that established his standing."  Maxwell, 778 F.3d at 732 (internal quotations and alterations omitted).  If a defendant "fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally."  Gomez, 16 F.3d at 256.

### A. Joe Mendez has no standing to challenge the search of the Silverado

The government argues that Joe Mendez does not have standing to challenge the search of the Silverado because he has no expectation of privacy in the Silverado since he was a passenger with no property or possessory

interest in the Silverado.  (Docs. 78, 93).  The government also argues that even if Joe Mendez argued he had standing because the stop was unreasonably extended, he still does not have standing because Trooper Hansen "was still in the process of writing the warning ticket and completing the ordinary inquires that go with a traffic stop when contraband was handed to Trooper Griffith by Joe Mendez."  (Doc. 93).

Joe Mendez argues he has standing to challenge the search of the Silverado because "he had a sufficiently close connection to objects searched to claim the search was illegal."  (Doc. 94).  Joe Mendez further argues that he voluntarily handed Trooper Griffith the hashish oil vaporizer and small jar of marijuana which was retrieved from his bag next to him that no one else in the Silverado had access to, and since these items were the sole basis for the search of the Silverado, he has standing.  (Doc. 94).

Here, Joe Mendez does not have standing to challenge the search of the Silverado because he has no expectation of privacy in the Silverado and the traffic stop was not illegally extended.

### 1. Joe Mendez did not have an Expectation of Privacy in the Silverado

Regarding the search of a vehicle, a passenger who asserts "neither a property nor a possessory interest" in the vehicle lacks a reasonable expectation of privacy and thus lacks Fourth Amendment standing.  Rakas, 439 U.S. at 148.  Numerous Eighth Circuit cases have observed a mere passenger generally does not have standing to challenge a vehicle search where he does not have a property or possessory interest in the vehicle.  United States

13

v. Russell, 847 F.3d 616, 619 (8th Cir. 2017); Anguiano, 795 F.3d at 878-79;

United States v. Marquez, 605 F.3d 604, 609 (8th Cir. 2010); United States v.

Barragan, 379 F.3d 524, 529-30 (8th Cir. 2004); United States v. Green, 275

F.3d 694, 698-99 (8th Cir. 2001).

      Here, there is no evidence that Joe Mendez either owned or had any type

of property or ownership interest in the Silverado.  There is also no evidence

that Joe Mendez was listed on the rental agreement.  In cases where bags with

contraband were found in the vicinity of where defendant was sitting in a

vehicle and defendants argued standing because of the vicinity, courts have

still focused on property and ownership interest in the vehicle itself.  See

United States v. Leiva, No. 19-cr-79-CJW, 2020 WL 1899051, (D. Iowa Jan. 9,

2020).  In Leiva, the court held that the defendant (a passenger in a vehicle)

lacked standing to challenge the search of the vehicle where a backpack was

found on the floor by where defendant had been sitting.  Id. at *7.  An inventory

search found drugs in the backpack.  Id. at *2.  Defendant denied knowledge of

the drugs in the backpack.  Id.  Defendant provided no direct evidence that he

had permission to use the vehicle, so the court found defendant lacked

standing to challenge the search of the vehicle.  Id. at *9.  See also United

States v. $32,780.00 in United States Currency, No. 8:15CV131, 2015 WL

13732188 (D. Neb. Sept. 30, 2015).  In $32,780.00, the defendant, the back

passenger in a rental vehicle told law enforcement that he had approximately

$30,000 in the vehicle and told them where to find it in the vehicle in his

personal bag.  Id. at *2.  Law enforcement found the canvas bag on the right

rear passenger floorboard and defendant claimed ownership of the bag.  Id. at
*3.  The court held that defendant lacked standing to challenge the search of
the rental vehicle, even though defendant presented evidence of brief and
limited use of the vehicle with the renter's permission over the course of a
multi-day trip.  Id. at *4.  The court held that the limited use was insufficient to
give rise to a legitimate and reasonable expectation of privacy.  Id.

Also, a passenger does not have standing when evidence located on or
around them provides the probable cause for the search of the vehicle if no
evidence of consent or permission for the vehicle is presented.  United States v.
Russell, 847 F.3d 616, 618 (8th Cir. 2017).  In Russell, officers found a small
bag of marijuana on the defendant (the passenger) and smelled marijuana
coming from the vehicle so the officer searched the vehicle and found a gun on
the passenger side.  Id.  The vehicle was a rental car leased to the defendant's
girlfriend but driven by another woman.  Id.  Defendant failed to present any
evidence that his girlfriend permitted him to drive the vehicle or that he had
any other possessory control over the vehicle, so the court held that he failed to
establish a reasonable expectation of privacy in the vehicle and therefore had
no standing to challenge the search.  Id. at 619.

As such, Joe Mendez lacks standing to challenge the search of the
Silverado because he lacks an expectation of privacy in the Silverado.  Like in
United States v. $32,780.00, Joe Mendez claimed ownership over the backpack
where contraband was taken from.  Similar to Russell, Joe's small jar of
marijuana and hashish oil vaporizer provided probable cause for the search of

15

the Silverado.  In <u>Leiva</u>, <u>$32,780.00</u> and <u>Russell</u>, each court focused on

whether defendant had presented evidence that they had permission to use the

vehicle.  Here, Joe Mendez failed to present any evidence that he was listed on

the rental agreement, or that he had permission to drive or otherwise exercise

any possessory control over the Silverado.

However, "[a] passenger may suppress evidence found in a vehicle when

an unreasonably extended traffic stop causes the search." <u>United States v.</u>

<u>Davis</u>, 943 F.3d 1129, 1132 (8th Cir. 2019).  So even when a defendant lacks a

possessory or property interest in the vehicle that would enable him to

challenge the search, "he may still contest the lawfulness of his own detention

and seek to suppress evidence as the fruit of his illegal detention." <u>See</u> <u>Green</u>,

275 F.3d at 699.  As discussed in detail below, the court finds that the stop

was not extended.

Even if Joe Mendez had standing to search the Silverado, this court's

recommendation to deny the Motion to Suppress would remain the same

because the motion fails on the merits for the reasons stated below.

### B. Nathan Mendez has no standing to challenge the search of the Silverado

Here, there are no facts to conclude that Nathan Mendez had an

ownership or possessory interest in the Silverado.  <u>See</u> <u>Barragan</u>, 379 F.3d at

530 (holding a passenger whose "name did not appear on any ownership

documents and . . . did not have an ownership interest" in the vehicle lacked

standing to challenge the search of the vehicle").  Furthermore, Nathan fails to

prove any facts demonstrating he had a reasonable expectation of privacy in

16

the Silverado or was anything more than a mere passenger.  See Anguiano, 795

F.3d at 878.  Because Nathan was a mere passenger, he had no legitimate

expectation of privacy in the Silverado, and accordingly, has no standing to

challenge the search.  See Rakas, 439 U.S. at 148.

However, "[a] passenger may suppress evidence found in a vehicle when

an unreasonably extended traffic stop causes the search."  See Davis, 943 F.3d

at 1132.  So even when a defendant lacks a possessory or property interest in

the vehicle that would enable him to challenge the search, "he may still contest

the lawfulness of his own detention and seek to suppress evidence as the fruit

of his illegal detention."  See Green, 275 F.3d at 699.  As discussed in detail

below, the court recommends that the stop was not extended.

Even if Nathan Mendez had standing to challenge the search, this court's

recommendation to deny the Motion to Suppress would remain the same

because the motion fails on the merits for the reasons stated below.

Even though Joe Mendez and Nathan Mendez do not have standing to

challenge the search of the Silverado, the court will analyze the merits of the

motion to suppress since Ms. Guardado filed a motion to join in Joe Mendez's

Motion to Suppress.

## II. Trooper Hansen had Probable Cause to Conduct the Traffic Stop

The Fourth Amendment of the U.S. Constitution provides the right of the

people "to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated, and no Warrants

shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In terms of the Fourth Amendment, the law is settled that "a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  Brendlin v. California, 551 U.S. 249, 255 (2007) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  "For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest. . . .  As such, a traffic stop is governed by the principles of Terry v. Ohio . . . ."  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984); Terry v. Ohio, 392 U.S. 1 (1968)).

Therefore, to be valid pursuant to the Fourth Amendment, a traffic stop "must be supported by reasonable suspicion or probable cause."  United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008) (internal citations omitted).

> A law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.  The more rigorous standard of probable cause exists when the totality of the circumstances justifies the belief that a crime has been committed and the person being seized committed it.

Id. (internal quotations omitted).  "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation.  This is true even if a valid traffic stop is a pretext for other investigation."  United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted).  Pursuant to South Dakota Codified Law regarding traffic violations, "no person may drive a

vehicle upon a street or highway at a speed in excess of sixty-five miles per hour. A violation of this section is a Class 2 misdemeanor." SDCL § 32-25-1.1.

In this case, Trooper Hansen conducted a lawful traffic stop. Trooper Hansen testified that as the Silverado approached, the two occupants of the Silverado he could see at the time continued to look straight ahead as the Silverado passed the three patrol vehicles, which Trooper Hansen believed to be unusual because people usually look when there are three patrol cars sitting on the side of the road.[2] Trooper Hansen testified he observed that the Silverado appeared to be going above the posted speed limit of 65 miles per hour, so he used his rear radar to get a reading of the Silverado's speed, which radar gave a reading of 70 miles per hour and locked in at 69 miles per hour. South Dakota sets a maximum speed of 65 miles per hour on a highway. SDCL § 32-25-1.1. Trooper Hansen pulled onto the road and began to catch up to the Silverado to initiate a traffic stop. Before initiating the stop, Trooper Hansen testified that he verified the Silverado's speed once again with his front radar, which showed a speed of 68 miles per hour. The court finds Trooper

---

[2] The parties spent a great deal of time at the suppression hearing focusing on the cleanliness of the exterior of the Silverado. Trooper Hansen testified that he initially noticed the Silverado because it was cleaner than most vehicles in the winter in South Dakota. A review of the video shows that the Silverado did not seem that much more clean than other vehicles and there was no snow on the ground to justify the inference that most vehicles had road grime from plows, etc. (Ex. 1). While the video does not corroborate Trooper Hansen's testimony, the court finds this portion of the evidence insignificant as to whether there was probable cause to stop the vehicle. It may have some relevance as one of the many factors that lead to the decision to search the car, given that it would be somewhat unusual to spend money on a car wash for a rental vehicle. The court further finds that this inconsistency does not render Trooper Hansen's other testimony as not credible.

Hansen's testimony regarding Ms. Guardado's speed credible, despite there not being a radar reading shown on the video or on the citation. (Ex. 1, 4). Therefore, by traveling at three, four and five miles per hour over the speed limit, a South Dakota traffic violation was committed. This traffic violation gave Trooper Hansen probable cause to stop the Silverado, regardless of Trooper Hansen's subjective motives of drug interdiction arising from his suspicions of the Silverado being too clean and the passengers of the Silverado not looking at the three patrol vehicles on the side of the road. See Sallis, 507 F.3d at 649. See also Whren v. United States, 517 U.S. 806, 813 (1996) (holding "constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved").

### III.    The Traffic Stop Was Not Improperly Extended

The government argues that the stop was not extended because Trooper Hansen was "still in the process of writing the warning ticket and completing ordinary inquiries that go with a traffic stop" when Joe handed the drugs to Trooper Griffith. (Doc. 93). Also, the government argues that the stop was not extended due to numerous statements, strange behavior and inconsistencies that constituted reasonable suspicion to justify further detention of the Silverado's occupants. (Doc. 93). Joe Mendez argues that the stop was extended when Trooper Griffith questioned Joe about drugs, which exceeded the mission of the traffic stop because Trooper Griffith had no reasonable suspicion to question Joe about drugs. (Doc. 94). Joe concedes that the traffic stop was incomplete, and that Trooper Hansen had not completed the warning

20

citation when Trooper Griffith began speaking with the Joe and Nathan about

drugs.  (Doc. 94).  However, Joe argues that the timing of when the warning

was issued is not important, but the critical issue is whether the officer's

conduct prolonged the stop.  (Doc. 94).  Also, Joe argues that the troopers had

no reason to search beyond the cab of the Silverado.  (Doc. 94).

> The Eighth Circuit has repeatedly held that:
>
> [I]f a defendant is detained incident to a traffic stop, the officer
> does not need reasonable suspicion to continue the detention until
> the purpose of the traffic stop has been completed.  Occupants . . .
> may be detained while the officer completes a number of routine
> but somewhat time-consuming tasks related to the traffic violation.
> These tasks can include a computerized check of the vehicle's
> registration and the driver's license and criminal history, as well as
> the reparation of a citation or warning.  The officer may also ask
> questions about the occupant's travel itinerary.

United States v. Gunnell, 775 F.3d 1079, 1083-84) (8th Cir. 2015) (quoting

United States v. Ovando-Garzo, 752 F.3d 1161, 1163-64 (8th Cir. 2014)).  A

reasonable investigation also includes "requesting the driver to sit in the patrol

car to answer questions, verifying the driver's identification and related

documents, and asking questions about the driver's itinerary."  United States

v. McCarty, 612 F.3d 1020, 1024-25 (8th Cir. 2010) (citing United States v.

Ward, 484 F.3d 1059, 1061-62 (8th Cir. 2007), and Jones, 269 F.3d at 924-

25).  "The scope of the traffic stop can be expanded if the driver's answers and

behavior 'support suspicions unrelated to the traffic offense.'"  McCarty, 612

F.3d at 1025 (citing Ward, 282 F.3d at 1062).  After the initial stop is

completed, an officer may only continue to detain occupants of a vehicle if the

officer is aware of "particularized, objective facts which, taken together with

rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." McCarty, 612 F.3d at 1025 (quoting United States v. Shafer, 608 F.3d 1056, 1062 (8th Cir. 2010)).  In determining whether an officer has reasonable suspicion to expand the scope of a traffic stop, the totality of the circumstances, in light of the officer's experience, is taken into consideration.  See McCarty, 612 F.3d at 1025.

The Fourth Amendment allows certain unrelated investigations that do not extend the detention, meaning an officer may ask questions unrelated to the traffic stop if they do not prolong the traffic stop.  Rodriguez v. United States, 575 U.S. 348, 354-55 (2015); Arizona v. Johnson, 555 U.S. 323, 333 (2009).  Here, Trooper Griffith's discussions and questions about drugs did not prolong the traffic stop.  The court reviewed Trooper Griffith's patrol video/audio and his discussions with Joe Mendez and Nathan Mendez.  (Ex. 2). Trooper Griffith is heard talking to the passengers about drugs (he asks no initial questions about drugs) and then a male voice says he has a jar of weed. (Ex. 2).  Trooper Griffith testified at the suppression hearing that it was Joe Mendez who volunteered he had a jar of weed, which he handed to Trooper Griffith, and then also produced a hashish oil vaporizer.  (Doc. 88 at pp. 114-115).  At this point, Trooper Griffith asks whether there are weapons, additional drugs, or large amounts of cash in the Silverado.  (Ex. 2).

Meanwhile, Trooper Hansen is in his patrol car with Ms. Guardado.  (Ex. 1).  The court reviewed Trooper Hansen's patrol vehicle video/audio which showed Trooper Hansen in his vehicle with Ms. Guardado asking routine

questions of Ms. Guardado when Trooper Griffith handed the small jar of marijuana and hashish oil vaporizer to Trooper Jackson who then put them on the hood of Trooper Hansen's patrol vehicle. (Ex. 1). At almost the exact moment Trooper Jackson put the marijuana container on Trooper Hansen's vehicle, Ms. Guardado was finishing up explaining why they wanted to visit Mt. Rushmore, and Trooper Hansen then asked what Ms. Guardado did she for work. (Ex. 1). Trooper Hansen had not completed the written warning yet. (Ex. 1). Trooper Hansen was permitted to ask these routine questions of Ms. Guardado. Trooper Hansen then pointed out the marijuana container to Ms. Guardado and asked her if there were any other drugs in the Silverado. (Ex. 1). This gave Trooper Hansen reasonable suspicion to ask Ms. Guardado about drugs in the Silverado. McCarty, 612 F.3d at 1025.

In addition, from the time Trooper Hansen advised Ms. Guardado that he would be issuing her a warning until when Trooper Hansen noticed the small jar of marijuana and hashish oil vaporizer being placed on his hood and asked Ms. Guardado about it, approximately seven minutes and sixteen seconds had elapsed. (Ex. 1). During those seven minutes and sixteen seconds, Trooper Hansen had asked Ms. Guardado about her trip, had reviewed the initial rental agreement and the correct rental agreement, while working on completing the warning. (Ex. 1). Trooper Hansen worked expeditiously to complete the warning and did not prolong the stop. See Rodriguez, 575 U.S. at 354-55.

As such, Trooper Griffith's drug interdiction discussion and questions with Joe Mendez and Nathan Mendez did not prolong the stop because the

23

legitimate purpose of the stop (issuing the written warning) had not yet been concluded by Trooper Hansen.  See Rodriguez, 575 U.S. at 354-55.

In addition, under a totality of the circumstances, the troopers also had reasonable suspicion to extend the traffic stop.  United States v. Gill, 513 F.3d 836, 844 (8th Cir. 2008) ("Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience.").

The troopers were suspicious, based on their training and experience, that the vehicle contained contraband.  Troopers Hansen, Griffith, and Jackson testified that they are drug interdiction officers and have special training in indicators of drug trafficking.  (Doc. 88 at pp. 6-7, 67, 153).  In addition, Troopers Hansen and Jackson testified that they see a large number of illegal substances traveling along Highway 18, and that it is a common back route, which is why it is one of the roads they target.  (Doc. 88 at pp. 9, 156).

The troopers testified that the following observations gave rise to their suspicions:

(1) The occupants of the Silverado did not look over at the three officers parked along the side of the road, which was suspicious because that typically draws attention.  (Doc. 88 at pp. 12-13).

(2) The bed of the Silverado (a rental vehicle) was empty, which was suspicious because people typically rent trucks to utilize the bed of the truck since they tend to be less fuel efficient.  (Doc. 88 at p. 18).

24

(3) The Silverado had an aftermarket bed liner with what appeared to be aftermarket screws in addition to the factory screws, which was suspicious because typically rental trucks do not have bed liners and if they do, they usually do not contain aftermarket screws that don't match the color of the bed liner.  (Doc. 88 at p. 32).

(4) There were two electronic items secured to the windshield, a cell phone and a GPS type device, both with a map on the screen, which was suspicious to have two different devices giving them directions.  (Doc. 88 at pp. 18-19).

(5) The inside of the Silverado was dirty with trash like the occupants had spent significant time in the Silverado, especially as compared to the outside of the Silverado.  (Doc. 88 at p. 19).

(6) Nathan Mendez was extremely nervous and avoided eye contact. (Doc. 88 at p. 20).

(7) Joe Mendez avoided eye contact and had a marijuana tattoo on his forearm.  (Doc. 88 at p. 20).

(8) Ms. Guardado was nervous, even after being told she would only be receiving a warning, her neck artery was pounding, she was breathing heavy and avoided eye contact.  (Doc. 88 at pp. 17-18, 28).

(9) Ms. Guardado initially provided a rental agreement that was not in her name and was for over a month prior, which was extremely suspicious because it is rare for a large rental company (Hertz) to give someone an old

rental agreement and/or a rental agreement for someone else. (Doc. 88 at p. 24).

(10) The return date on the correct rental agreement did not match Ms. Guardado's statements, she advised it was due back the following Sunday, but the rental agreement stated it was due back in two days, on Tuesday. (Doc. 88 at pp. 25, 27).

(11) There were inconsistencies and hesitant answers between the parties when asked about their travel plans. Ms. Guardado advised that they were coming from California and going to see Mt. Rushmore because she had always wanted to see it and then going right back to California, but was unsure what day they left California, whether it was Tuesday or Wednesday (the rental agreement stated that the Silverado was rented on Tuesday), what had caused their delay in leaving California (she said it was both rain and snow), and where they were going to stay (she thought Custer but with hesitation). (Doc. 88 at pp. 28-29) (Ex. 1). Nathan and Joe Mendez advised that they had spent over a day in California prior to leaving, which Trooper Griffith thought was suspicious. (Doc. 88 at p. 112) (Ex. 1). They gave a couple of different answers (one was Wednesday and one was Thursday) when asked when they had left California. (Doc. 88 at p. 112). Joe Mendez advised that they had gotten stuck in a snowstorm near Colfax, California. (Doc. 88 at pp. 112-113) (Ex. 1). The parties gave inconsistent answers as to how they were related. (Doc. 88 at p. 96).

(12) They had very little luggage compared to the length of the trip, and there was a lack of warm weather clothing.  (Doc. 88 at pp. 19-20).

 Trooper Hansen testified that all of these observations and suspicions put together gave him and the other troopers reasonable suspicion that the vehicle contained contraband.  (Doc. 88 at pp. 94-97).

Thus, considered in light of the troopers' experience, the totality of the circumstances suggested that the vehicle contained contraband and the troopers' suspicions were reasonably warranted and justified in expanding the traffic stop.  See McCarty, 612 F.3d at 1025.  The stop was not improperly extended.

## IV.    Probable Cause Existed to Search the Silverado

"It is well settled that a warrantless search of an automobile is not unreasonable if law enforcement officers have probable cause to believe that the vehicle contains evidence of criminal activity."  United States v. Daniel, 809 F.3d 447, 448 (8th Cir. 2016) (citing United States v. Ross, 456 U.S. 798, 823-24 (1982)).  "Probable cause exists when the facts available to an officer would warrant a person of reasonable caution to believe that contraband or other evidence of a crime is present."  See Daniel, 809 F.3d at 448-449 (internal citations omitted).  Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity."  United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (quoting United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997)).

If probable cause exists in support of the automobile exception, the search may encompass the entire passenger compartment of the automobile, its trunk, and all containers, packages, and compartments located in the vehicle so long as there is probable cause to believe that the object of the search may be found there. United States v. Caves, 890 F.2d 87, 90 (8th Cir. 1989); United States v. Englehart, 811 F.3d 1034, 1042 (8th Cir. 2016).

Probable cause to conduct a search of the entire vehicle may stem from a lawful traffic stop if police reasonably believe, at the time they begin the search, that contraband or evidence of criminal activity is in the vehicle. United States v. Caves, 890 F.2d 87, 90 (8th Cir. 1989) (quoting Brinegar v. United States, 338 U.S. 160, 175–76 (1949)). "It is the characteristic mobility of all automobiles, not the relative mobility of the car in a given case, that . . . allows for warrantless searches when probable cause exists." United States v. Perry, 925 F.2d 1077, 1080 n.4 (8th Cir. 1991).

Ms. Guardado's speeding alone, while providing probable cause to conduct a traffic stop, was not probable cause to search the Silverado. See Arizona v. Gant, 556 U.S. 332, 344 (2009) (holding that there was no probable cause to search a vehicle where "[Defendant]" was arrested for driving with a suspended license – an offense for which police could not expect to find evidence in the passenger compartment of [Defendant's] car").

However, probable cause did exist to search the Silverado, because, prior to the search, Joe Mendez handed over the small jar of marijuana and hashish oil vaporizer to Trooper Griffith, along with all of the other factors outlined in

28

Section III of this Report and Recommendation.  (Doc. 88 at pp. 114-115).
Trooper Griffith's patrol video/audio confirms this conversation.  (Ex. 2).  Joe
Mendez's admission provided probable cause for law enforcement to search the
Silverado for "offense-related evidence."  See Arizona, 556 U.S. at 344.  "If
probable cause justifies the search of a lawfully stopped vehicle, it justifies the
search of every part of the vehicle and its contents that may conceal the object
of the search."  United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir.
2007) (quoting Ross, 456 U.S. at 825).

Neither the Eighth Circuit nor the United States Supreme Court has
limited the automobile exception to situations where the defendant possesses a
*criminal or minimal* amount of contraband.  Joe Mendez relies on Garrett v.
Goodwin, 569 F. Supp 106 (E.D. Ark. 1982) along with SDCL § 22-42-6 to
argue that "being handed less than two ounces of marijuana does not establish
probable cause to believe drugs or other marijuana will be found in transport"
in support of his argument that the troopers had no reason to search beyond
the cab of the Silverado.  (Doc. 94).  In Garrett, defendants were stopped at a
roadblock and their vehicles were searched based on officers allegedly seeing
marijuana seeds on the floorboard and a marijuana cigarette butt in the
vehicle's ashtray.  Id. at 119.  The court held that without more, the items
found "only provides probable cause to believe that small amounts of
marijuana for personal use may be found in the vicinity of what was found."
Id. at 120.  In addition, the court stated that "as a general rule, probable cause
to search . . . should not arise until the inference level of possession with intent

to deliver a controlled substance were passed by what was found" in the vicinity, which amount is determined by state law.  Id. at 120.  Joe Mendez argues that South Dakota law classifies less than or equal to two ounces of marijuana as a minimal amount.  (Doc. 94).  SDCL § 22-42-6 states that two ounces or less of marijuana is a Class 1 misdemeanor and more than two ounces are varying degrees of felonies.

However, here, unlike in Garrett, there is more than just the small jar of marijuana and the hashish oil vaporizer.  The troopers found a St. Jude necklace in the center console of the Silverado, which was suspicious because St. Jude is the patron saint of drug smuggling and troopers see it often with people who smuggle drugs.  (Doc. 88 at pp. 33, 127).  In addition, on the underside of the vehicle, officers noticed tooling marks at the bolts that hold the bed of the pickup in place and that several bolts were missing, they also took a picture of the top of the gas tank which showed dirt that was out of place, and fingerprints.  (Doc. 88 at pp. 23-34, 63, 118-120).  Trooper Griffith testified that there are a few ways to access the vehicle's gas tank, from under the vehicle and by removing the bed of the truck.  (Doc. 88 at pp. 119-120).  Trooper Griffith testified that he noticed tooling marks on bolts accessing the gas tank from underneath the vehicle, and also tooling on the bolts that hold the bed to the frame, which is suspicious because drug traffickers will often use fuel tanks to store contraband.  (Doc. 88 at pp. 119-120).

The Eighth Circuit has held that the search of a vehicle's gas tank was proper after defendant admitted there was marijuana in the car.  See McCarty,

612 F.3d at 1026.  In McCarty, the officer provided a specific and objectively reasonable basis for his suspicion that the gas tank contained contraband due to his testimony of scratch markings on the underside of the gas tank, tooling marks on bolts that secure the straps to the gas tank, and that the gas tank was fairly clean, but the undercarriage of the vehicle was dirty.  Id. at 1023, 1024, 1026.  The court held that there was probable cause to search every part of the vehicle based on the discovery of marijuana "because drug traffickers are known to stow contraband in secret compartments."  Id. at 1026 (citing United States v. Hernandez-Mendoza, 600 F.3d 971, 976 (8th Cir. 2010); United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir. 2007).

Joe Mendez, in his brief, argues that the court should decline to follow McCarty because McCarty reflects the law prior to the United States Supreme Court's decision in Rodriguez v. United States, 575 U.S. 348 (2015).  (Doc. 94).  However, the court need not denounce McCarty since the troopers' actions here do not run afoul of Rodriguez.

Probable cause from the small jar of marijuana and the hashish oil vaporizer, coupled with the troopers' observations as described above lead the court to conclude that the search of the entire vehicle, including the search of the gas tank was proper.  See McCarty, 612 F.3d at 1026 (holding "a search of every part of a vehicle that might contain contraband was authorized, because drug traffickers are known to stow contraband in secret compartments") (citing Hernandez-Mendoza, 600 F.3d at 976).

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress (Doc. 68) be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 19th day of November, 2021.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge

32