UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>NATHAN RYAN MENDEZ,<br>JOE ADOLPH MENDEZ and<br>ERIKA JEANETTE GUARDADO,<br><br>                    Defendants. | CR. 21-50024-JLV<br><br><br>ORDER |

## INTRODUCTION

On February 19, 2021, a grand jury indicted defendants Erika
Guardado, Joe Adolph Mendez and Nathan Ryan Mendez for possession with
intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1)
and 841(b)(1)(A). (Docket 44). On May 5, 2021, defendant Joe Mendez filed a
motion to suppress evidence with a supporting memorandum. (Dockets 68 &
69). Defendants Erika Guardado and Nathan Mendez each filed motions to
join in Joe Mendez's motion to suppress. (Dockets 70 & 72). In response, the
government filed a memorandum opposing the motion. (Docket 78). The
motion was referred to Magistrate Judge Daneta Wollmann pursuant to
28 U.S.C. § 636(b)(1)(B) and the court's April 1, 2018, standing order. The
magistrate judge conducted an evidentiary hearing on August 5, 2021. (Docket
84). A transcript of the hearing was filed in the case on August 27, 2021.
(Docket 88). On September 24, 2021, the government filed a second

memorandum opposing the motion to suppress.  On October 8, 2021, Joe Mendez filed a memorandum in response to the government's second memorandum and in support of his motion to suppress.  (Docket 94). Defendants Erika Guardado and Nathan Mendez moved to join in Joe Mendez's October 8 memorandum.  (Docket 95 & 96).

On November 19, 2021, Judge Wollmann filed a report and recommendation ("R&R") recommending the court deny the motion to suppress.  (Docket 98).  All three defendants filed objections to the R&R. (Dockets 99, 100 & 101).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  Id.  The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  Id.; see also Fed. R. Crim. P. 59(b)(3).

In light of the numerous and wide ranging legal and factual objections to the R&R filed by the three defendants, the court reviewed *de novo* the magistrate judge's R&R, the transcript of the evidentiary hearing, the parties pre- and post-hearing briefing and all exhibits submitted.  For the reasons given below, the court overrules the defendants' objections, adopts the R&R and denies the motion to suppress.

2

**MOTION TO SUPPRESS**

Defendants assert the stop and seizure of their vehicle was constitutionally invalid because law enforcement lacked probable cause to conduct a traffic stop.  (Docket 69 at p. 4).  They assert the subsequent search of the vehicle was also invalid because officers lacked the necessary probable cause.  Id. at p. 6.  Finally, they argue that, even if the court finds the initial traffic stop constitutionally permissible, the stop nevertheless became invalid when it was extended beyond the lawful duration.  Id. at p. 7.  Defendants request the court exclude all evidence and statements by defendants stemming from what they claim was an invalid stop, seizure and search of their vehicle. (Docket 68 at p. 2).  The government maintains probable cause existed for the initial traffic stop and the subsequent search of defendants' vehicle and that the stop did not extend beyond the lawful duration.  (Docket 78 at pp. 7-17). The government requests the court deny the motion to suppress in its entirety. Id. at p. 20.

**FACTUAL BACKGROUND**

The following factual summary is drawn from the court's *de novo* review of the magistrate judge's R&R, the transcript of the evidentiary hearing, the parties pre- and post-hearing briefing and all exhibits submitted at the hearing.

In the late afternoon on January 31, 2021, South Dakota Highway Patrol troopers Brandon Hansen, Stewart Griffeth and Tyler Jackson were each stationary in their respective patrol vehicles in a field approach on Highway 18

several miles from the town of Edgemont, South Dakota.  (Docket 88 at pp. 9-10).  All three troopers are part of the South Dakota Highway Patrol's Police Service Dog Unit, focused on criminal interdiction—particularly the detection and confiscation of illegal drugs.  Id. at p. 10.  All three received more training about drug trafficking than the average trooper and have often worked with the local drug task force in western South Dakota.  Id.

At approximately 4:15 p.m. on January 31, 2021, a red Chevrolet Silverado pickup truck with California license plates, heading eastbound on Highway 18, approached the troopers' location.  Id. at p. 11.  At the suppression hearing, Trooper Hansen testified he observed the Silverado approaching and that, immediately, the truck stuck out to him because "it was extremely clean, to the point where it looked like it had been washed recently." Id.  He testified the vehicle's cleanliness was "significant[] because the majority of the cars driving by" him that day had "road grime [on them]," which he presumed was from "the plows and .  . . debris that's left behind in the wintertime."  Id. at pp. 11-12.  Trooper Hansen immediately suspected the Silverado was a rental vehicle, which he "see[s] a lot of . . . in this area, especially . . . with the tourist environment" in western South Dakota.  Id. at p. 12.  He later testified he had "never heard of somebody going through a car wash and spending money to wash a rental vehicle."  Id. at p. 87.  Trooper Hansen would eventually learn the Silverado "had traveled across country through areas that had apparently been shut down from a snowstorm, [yet]

4

there [was] not a bit of road grime on the outside of th[e] vehicle." Id.  He testified that fact ultimately became a "relevant . . .  piece of the puzzle" in his assessment of the totality of the circumstances that day because, to him, it was an indication "that [the travelers were] trying to blend in and not stick out."  Id.

Trooper Griffeth, who was in his own vehicle next to Trooper Hansen's, testified that he also observed the Silverado and initially noted "the vehicle was very clean," and "the female driver had both hands on the steering wheel and had . . . a fixed gaze straight ahead." Id. at p. 103.  He, too, noted that, "in the wintertime, vehicles traveling across country usually have some level of road grime on them because of road salt and snow."  Id.

Trooper Hansen testified that, when the Silverado passed him, he saw a female driver and a male riding in the front passenger seat.  Id. at p. 12.  He noted "both occupants . . . continued to look straight ahead and did not look over at the patrol cars[] and tried to focus completely on the road ahead of them."  Id.  This detail also stood out to Trooper Hansen because "[t]ypically, . . . three [] patrol cars sitting on the side of the road" would get the attention of passing drivers, and "they will generally look over."  Id. At pp. 12-13.  The behavior he witnessed from the driver and front seat passenger in the Silverado—looking ahead at the road in the direction they were traveling instead of over at the patrol vehicles—is "common[]" behavior for "people . . . trafficking illegal drugs."  Id. At p. 13.

As Trooper Hansen explained at the hearing, when the Silverado passed him, he "observ[ed] that [it] appear[ed] to be going above the speed limit, which is posted as 65 miles per hour." Id. At that point, he turned on his rear radar, which gave him a reading of 70 miles per hour. Id. He testified he "lock[ed] the vehicle's speed in at 69 miles per hour, so [he] pulled [out to follow the Silverado] and began to catch up to it to initiate a traffic stop." Id. "Prior to initiating the stop," he "verified the speed once again with [his] front radar, which showed a speed of 68 miles per hour." Id. Trooper Hansen initiated a traffic stop, which is when he noticed a third individual in the vehicle, a male who sat up in the backseat as the Silverado slowed down. Id. at p. 14.

When the Silverado was stopped, Trooper Hansen got out of his patrol car and approached the Silverado on its passenger side. Id. at p. 14. He "explain[ed] the reason for the stop and that it was a 65-mile-per-hour zone, and [he] requested a driver's license or vehicle documents from the occupants." Id. The driver, who provided her driver's license and a rental packet from Hertz, was identified as defendant Erika Guardado. Id. at p. 15. Trooper Hansen identified the front seat passenger as defendant Nathan Mendez and the backseat passenger as defendant Joe Mendez. Id. at p. 16.

Trooper Hansen testified he initially noted "the bed of the pickup was completely empty," which he thought was unusual because pickups "are generally way less fuel efficient than the majority of other vehicles on the road" and so "typically [people] rent[] a pickup for a reason, and it's to haul stuff or at

least utilize the bed." Id. at p. 18.  He also noticed two devices adhered to the Silverado's windshield—a cellphone and a GPS navigation device, both of which were being used for directions.  Id. at pp. 18-19.  Trooper Hansen said he noted at the time that the use of two separate devices for directions was "odd."  See id. at p. 19.  Later, he acknowledged that cell phone service in that location and westward into Wyoming was poor and that standalone GPS devices are "typically . . . a little bit more reliable" in such areas because of differences in the technologies.  Id. at p. 65.

Trooper Hansen testified the inside of the vehicle also appeared much dirtier than the outside, "like it had been driven a long distance and [the occupants had] spent some time in [it.]"  Id. at p. 19.  Trooper Hansen saw a case of water, two smaller duffel bags, a Walmart bag containing clothing and a shoebox in the backseat, which he considered to be items and an amount of luggage that were inconsistent with a longer trip.  Id.  Additionally, Trooper Hansen thought both Ms. Guardado and Nathan appeared nervous.  Id. at p. 20.  He testified Nathan "avoided eye contact at all costs, staring straight ahead out the window, even with [him] standing right next to the passenger window."  Id.  Joe also was apparently "avoiding [eye] contact," and Trooper Hansen noticed a marijuana leaf tattoo on Joe's forearm.  Id.

Trooper Hansen explained to Ms. Guardado that he had stopped her for speeding and was going to issue her a warning, and he asked her to accompany him back to his patrol car while he generated the warning.  Id. at

p. 17.  Trooper Hansen testified he typically tells someone he has pulled over whether he is going to issue them a written warning or a citation "right off the bat" so as not to leave them wondering which they are going to receive as they sit in the front passenger seat of the patrol car and in order to "help [them] relax" during the process.  Id.  Usually, Trooper Hansen stated, when individuals who are not involved in illegal activity learn they are only going to be issued a warning, their "nervousness substantially subsides."  Id.  For someone who is carrying illegal drugs, however, "[t]heir nervousness continues."  Id. at p. 18.  Trooper Hansen testified Ms. Guardado's nervousness remained "[e]xtremely elevated."  Id.  On cross-examination, Trooper Hansen acknowledged some people remain nervous throughout the entirety of a stop.  See id. at p. 69.

With Ms. Guardado in the front passenger seat of his patrol vehicle, Trooper Hansen began the process of issuing her a warning.  As he did so, he conversed with her.  He testified he "typically . . . talk[s] to [individuals] about their travels and tr[ies to] make small talk to make the time go a little bit faster for them so it's not just awkward silence as [he is issuing them] a written warning."  Id. at p. 22.  Ms. Guardado told Trooper Hansen that the travelers were from Lancaster, California, and were on their way to Mount Rushmore.  Id.  She said she had always wanted to see Mount Rushmore.  Id.  They had driven "straight through from California" and planned to visit Mount Rushmore and then return to California.  Id. at p. 23.  When Trooper Hansen asked her if

they had plans to stay anywhere in particular, Ms. Guardado told him they did not and that "they were going to figure it out when they got [there]" but were thinking of perhaps staying in Custer.  Id.  Trooper Hansen believed this to be a suspicious answer because, as he testified, people "that are from the area know that a lot of the smaller towns in the area," like Custer, "shut down during the wintertime" and "[s]everal of the hotels are not even open."  Id. at p. 36.  However, some of them remain open, as Trooper Hansen later acknowledged upon further questioning.  See id. at p. 59.  And Ms. Guardado, as she told Trooper Hansen, had never been to South Dakota before.  See id. at p. 88.

While issuing Ms. Guardado a warning, Trooper Hansen at one point turned his attention to the Hertz rental packet he had been provided, which he noticed contained paperwork for a reservation for the end of December 2020 which had been made by an individual who was not among the defendants.  Id. at p. 24.  Ms. Guardado told Trooper Hansen that was all she had been provided by the rental company, which Trooper Hansen testified heightened his suspicion of the travelers.  Id.  He stated "a rental company as large as Hertz[] is not going to give [someone] an old rental agreement[,] and it's certainly not going to give [someone] a rental agreement for somebody else."  Id.  Ms. Guardado also told Trooper Hansen the vehicle was due back in California the following Sunday, exactly one week later.  Id. at p. 25.  But she also said they had been told they could call the company to extend the rental.  Id.

9

During the conversation between Trooper Hansen and Ms. Guardado, Troopers Griffeth and Jackson pulled up at the scene. Id. at p. 26. Trooper Hansen reapproached the Silverado and explained to Joe that he needed to locate the correct rental agreement. Id. Trooper Griffeth remained at the Silverado with Joe and Nathan while Joe searched for the correct paperwork and Trooper Hansen returned to his patrol vehicle to continue working on the warning. Id. at pp. 26-27. When Joe located the correct paperwork and it was provided to Trooper Hansen by Trooper Griffeth, Trooper Hansen discovered the reservation was actually through Tuesday, February 2, just two days later. Id. at p. 27. When Trooper Griffeth brought Trooper Hansen the correct rental agreement, Trooper Griffeth also told Trooper Hansen he had observed alcohol containers in the Silverado. Id. at p. 29.

Trooper Hansen testified that, as he continued to speak with Ms. Guardado, she continued to appear "extremely nervous." Id. at p. 28. He could "see the artery in the side of her neck pounding," and "she was breathing extremely heavily" and avoiding eye contact. Id. She was also "hesitant [about] what day they [had] left," saying it was "either Tuesday or Wednesday." Id. And she explained they had been delayed because "there had been some rain" and then also "maybe some snowfall that got them stuck" in the mountains near Colfax, California, so they had not been able to leave California right away, but she seemed hesitant as she recalled the information for Trooper

Hansen. <u>Id.</u> at p. 29. She also stated Joe was her husband and Nathan was her son, but then clarified Nathan was actually her stepson. <u>Id.</u> at p. 31.

After Trooper Griffeth brought the correct rental agreement to Trooper Hansen, he returned to the Silverado, where he spoke with Joe. <u>Id.</u> at p. 29. During the course of his conversation with Joe, Trooper Griffeth noticed the smell of alcohol. <u>See id.</u> at p. 110. He saw beer cans inside the vehicle, so he asked Joe about them. <u>See id.</u> Joe explained the box of beer cans had spilled but there were no open containers. <u>See id.</u> at pp. 110-11. Trooper Griffeth further testified Joe and Nathan told him they were traveling to visit Mount Rushmore, but when he learned the car was due back in California in only a couple days, he believed that story was "improbable." <u>Id.</u> at p. 112. He also testified they gave him a couple different answers about when they left California, and that they had "spent over a day in California prior to leaving," which Trooper Griffeth also believed to be "somewhat suspicious," even though Joe explained to him that it had been because "they got stuck in a snowstorm near Colfax." <u>Id.</u>

Trooper Griffeth went on to explain to Joe and Nathan his role with the service dog unit and that part of his job is to talk with people about drugs and other criminal activity. <u>See id.</u> at p. 113. He "talked to them about . . . personal use marijuana, because that [is] the thing [he] see[s] the most," and he "explained that if they had personal use marijuana, it would not be that big of a deal"—he could simply "write [them] a ticket" and let them go. <u>Id.</u> Trooper

11

Griffeth testified he commonly has these conversations with travelers he believes could be carrying illegal drugs.  See id. at p. 114.  Joe, in response, told Trooper Griffeth he did have some marijuana on him.  See id. at p. 115. Joe retrieved a small jar containing marijuana from a backpack on the seat next to him, as well as a hashish oil vaporizer, and handed those to Trooper Griffeth.  See id.  Joe and Nathan denied having additional drugs in the vehicle. See id. at p. 125.

Meanwhile, as Trooper Hansen continued the process of issuing Ms. Guardado a warning, he observed Trooper Griffeth speaking with Joe and saw Joe hand Trooper Griffeth a container.  Id. at p. 30.  Shortly thereafter, when Trooper Griffith handed the container to Trooper Jackson who then brought it over to Trooper Hansen's vehicle and set it on the hood, Trooper Hansen "could see that it contained what appeared to be marijuana."  Id.  Trooper Griffeth also placed the vaporizer pen and cartridge on the hood of Trooper Hansen's car.  Id.  When the container and vaporizer were placed on his hood, Trooper Hansen asked Ms. Guardado about illegal drugs.  Id.  She told him everything that had been in the Silverado was on his hood.  Id. at p. 31.  She also said she had used marijuana several weeks prior.  Id.

Trooper Hansen got out of his vehicle to speak with Joe.  Id. at p. 35.  He testified that, during their conversation, Joe "appeared extremely hesitant."  Id. Joe told Trooper Hansen that "Ms. Guardado was extremely excited to be able to go skiing, and he even got her ski boots out and stuff, ready to go."  Id. at

12

pp. 35-36.  Trooper Hansen believed this information was suspicious because it was inconsistent with the information Ms. Guardado provided him about the reasons and plans for their trip.

Based on the information collected by Troopers Hansen and Griffeth during the course of the stop up to that point and the container of marijuana, the troopers decided to search the Silverado.  Id. at p. 32.

At the outset of the vehicle search, the troopers "noticed . . . the bed of th[e] pickup had an aftermarket-type bed liner."  Id. at p. 32.  In addition, they noticed not only the black, plastic factory screws in the liner, but also additional silver screws.  Id.  That was notable to Trooper Hansen because "[t]here are very often no bed liners in [rental] vehicle[s,] and if there are," they do not typically also have "aftermarket screws that don't match the color of the bed liner."  Id.  [The troopers] believed these irregularities were indicative of "[s]ome sort of tampering."  Id.

Inside the vehicle, the troopers found a receipt from an Arby's in Lost Hills, California.  Id. at pp. 32-33.  Trooper Hansen noted that the receipt, which was issued only 144 miles from where the vehicle was rented, indicated the party had traveled only that far in just over a day's time.  Id. at p. 33.  They also found a St. Jude necklace.  Id.  Trooper Hansen acknowledged at the hearing that "St. Jude is a legitimate Catholic Church saint."  Id.  But he also testified that "one of the things [law enforcement] see[s] a lot of times with people who smuggle contraband, specifically drugs, is that the patron saint of

13

drug smuggling is St. Jude." Id.  Trooper Hansen later clarified that he knows

the Catholic Church has not actually recognized a drug-dealing saint.  See id.

at p. 76.  He had meant that "St. Jude is commonly found . . . being used by

those that smuggle illegal contraband." Id. at p. 65.  Trooper Griffeth also

testified to the significance of finding a depiction of Saint Jude in a vehicle,

stating "St. Jude is often carried by people involved in smuggling . . . narcotics,

large amounts of currency, or [who are involved in] human trafficking." Id. at

p. 117.  He testified he has "found St. Jude at different times in [his] career

with large amounts of drugs or currency." Id.

Finally, the troopers noticed the clothing in the Walmart bag still had

tags and was "recently purchased in Wyoming." Id. at p. 33.  They also found

duffel bags with clothing, although Trooper Hansen believed the amount of

clothing was very "[m]inimal" for the length of the trip described by Ms.

Guardado.  See id. at p. 75.  The troopers did not find the ski boots Trooper

Hansen expected to see after his conversation with Joe.  See id. at p. 74.

While Troopers Hansen and Griffeth searched the interior of the vehicle,

Trooper Jackson stood with Nathan on the side of the road.  See id. at p. 159.

He asked Nathan questions about where the party was going, where they were

coming from and how long they had been traveling, but he testified that

Nathan "didn't have an answer for any of those" and just "said he wasn't sure

most of the time." Id.  Trooper Jackson noted that at one point Nathan told

him Joe was a car mechanic, but Joe had told Trooper Jackson that he was a

mechanic but did not work on cars.  See id. at p. 161.  Additionally, Nathan said they were visiting Mount Rushmore because he had wanted to after seeing it in the cartoon Phineas and Ferb.  See id. at p. 162.  Trooper Jackson subsequently spoke with Ms. Guardado, who told him they were going to Mount Rushmore because she had always wanted to see it and had time off from work.  See id.  Trooper Jackson ultimately let Nathan sit in Trooper Hansen's patrol vehicle and put Ms. Guardado in his own vehicle because it was getting cold, and then he assisted the other two troopers with searching the Silverado.  See id. at pp. 160 & 162.

After the troopers finished searching the inside of the Silverado, they continued their search of the vehicle by checking its underside.  There, they "noticed tooling marks at the bolts that hold the bed of the pickup in place[, indicating it] had been removed at one point."  Id. at p. 34.  "Several of the bolts were even missing."  Id.  Trooper Hansen testified that they used "a scope to obtain a picture [of] the top of the gas tank which showed dirt that was out of place and fingerprints."  Id.  Trooper Griffeth testified that his guess upon seeing the dirt on the fuel tank was that the fuel tank had been "clean because the pickup was fairly new, and the drug trafficking organization made it dirty to try to cover up what they did"—i.e., that they had removed it and were using it to store illegal drugs.  Id. at pp. 142-43.

At this point, about two hours after the initial traffic stop, the troopers believed the gas tank likely contained contraband and decided to transport the

vehicle to another location to continue their search and so they could remove the bed of the pickup in a safer location.  See id. at pp. 34, 78 & 121.  Trooper Hansen testified that "[g]oing through the bed of the pickup to access the fuel tank is a common way to get contraband into a fuel tank.  And putting an aftermarket bed liner over the place would hide that effort to get into the fuel tank.  So it [was] pertinent to remove the bed liner itself to see if there was tampering to get into the fuel tank."  Id. at p. 93.

The troopers transported the vehicle to the Edgemont fire station, where they removed the bed of the pickup and the sending unit from the top of the fuel tank.  Id.  Trooper Hansen noted that the "sending unit was really loose" compared to what he would have expected.  Id. at p. 34.  Once the sending unit was removed, he could see numerous packages floating inside the fuel tank. Id.  These packages contained what ultimately was determined to be about 40 pounds of methamphetamine.  Id.  In total, the entire stop and search took about six hours, lasting until around 10 p.m.  See id. at p. 145.

### MAGISTRATE JUDGE'S REPORT & RECOMMENDATION

Judge Wollmann filed her R&R on November 19, 2021.  (Docket 98).  She concluded, first and foremost, that Joe and Nathan do not have standing to challenge the stop and search.  See id. at pp. 11-17.  She further concluded the initial traffic stop was supported by probable cause and, therefore, was valid. See id. at p. 17-20.  In coming to that conclusion, Judge Wollman stated she found "Trooper Hansen's testimony regarding Ms. Guardado's speed credible

. . . ." <u>Id.</u> at p. 20.  Judge Wollmann next analyzed whether the traffic stop was impermissibly extended, finding that it was not.  <u>See id.</u> at pp. 20-27.  Finally, she found the search of the Silverado was supported by probable cause and, therefore, was also valid.  <u>See id.</u> at pp. 27-31.  She recommended the court deny the motion to suppress.  <u>Id.</u> at p. 32.

## DEFENDANTS' OBJECTIONS

Ms. Guardado and Joe Mendez each filed numerous objections to the R&R and joined in all objections filed by their co-defendants.  <u>See</u> Dockets 99 & 100.  Nathan Mendez filed objections of his own.  <u>See</u> Docket 101.  The court summarizes defendants' objections as follows:

1.  Ms. Guardado objects to the magistrate judge's finding that she was speeding and denies there was probable cause to support the initial traffic stop.  <u>See</u> Docket 99 at pp. 1-2.  Joe also objects, contending Trooper Hansen's testimony about the Silverado's speed is "unverifiable" and his failure to calibrate his RADAR when he turned it on to check the Silverado's speed calls into question the accuracy of the readings reported by Trooper Hansen.  (Docket 100 at p. 2).

2.  Ms. Guardado objects to the finding that the observations made by Trooper Hansen during the traffic stop of the defendants' behavior and characteristics of the Silverado provided probable cause to support the troopers' search of the vehicle.  <u>See</u> Docket 99 at pp. 2-3.

3. Ms. Guardado objects to the finding that the traffic stop was not impermissibly extended. <u>See</u> Docket 99 at p. 3. She also objects to the finding that there was probable cause to search the pickup. <u>See</u> Docket 99 at p. 4. She contends the stop was impermissibly extended because the facts relating to the troopers' observations of the defendants and the characteristics of the Silverado did not give rise to a reasonable suspicion criminal activity was afoot or probable cause to continue to detain the defendants for hours while the troopers searched the vehicle for contraband. <u>See</u> Docket 99 at pp. 3-5. Joe similarly objects, contending the stop was impermissibly extended beyond its original purpose (the issuance of a traffic citation) and turned into a six hour "hunting expedition" unrelated to that purpose. (Docket 100 at pp. 1-3). He also contends the troopers' "observations do not provide a basis for reasonable suspicion or probable cause" to search the vehicle. <u>Id.</u> at p. 4.

4. Ms. Guardado objects to the finding that law enforcement's search inside the Silverado's fuel tank was valid. <u>See</u> Docket 99 at p. 5. She asserts law enforcement was required to obtain a search warrant before removing the Silverado's bed and sending unit to search inside the fuel tank, rendering the search impermissible. <u>See</u> Docket 99 at pp. 5-6.

5. Joe objects to the finding that he did not have a reasonable expectation of privacy in the Silverado or standing to challenge the search of the Silverado.  (Docket 100 at pp. 3-4).  He argues, "law enforcement based its entire probable cause determination on the personal use marijuana and empty hash oil vaporizer provided to them from his backpack, from which he did have a privacy interest."  Id.

6. Joe objects to the factual conclusion that he "volunteered" the jar of personal use marijuana and the hash oil vaporizer.  (Docket 100 at p. 4).  He contends it "is improbable, given the record of the [t]roopers' testimony and their intent to target and then interdict vehicles for drugs, that Joe volunteered personal use marijuana or a hashish oil vaporizer without first being asked or otherwise prodded.  Thus, while the [t]roopers did not search and find any marijuana, once asked a direct question by Trooper Griff[e]th if he had any, Joe handed it over."  Id.

7. Finally, Nathan objects to the finding that his "detention continuing through the search in Edgemont was not an unreasonable extension of the stop," and, therefore, he argues he "does . . . have standing to challenge the stop" under United States v. Davis, 943 F.3d 1129 (8th Cir. 2019).  (Docket 101 at p. 1 (emphasis removed)).

19

## ANALYSIS

The court addresses the following issues raised by defendants' objections in order: (1) defendants' standing to challenge the stop, (2) the validity of the initial traffic stop, (3) the validity of the vehicle search, and (4) whether the traffic stop was impermissibly extended.

## I. Defendants' Standing to Challenge the Stop, Search, and Seizure

As a threshold matter, the court must address who among the three defendants has standing to challenge the stop and seizure at issue in the motion to suppress. "Fourth Amendment rights are personal rights that may not be asserted vicariously. An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (internal citation and quotation marks omitted). "The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." United States v. Russell, 847 F.3d 616, 618 (8th Cir. 2017) (internal quotation marks omitted). "Generally, a mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor possessory interest in the automobile.'" Id. (quoting United States v. Anguiano, 795 F.3d 873, 878 (8th Cir. 2015)). This is in keeping with the longstanding principle "'that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights

were violated by the search [or seizure] itself, not by those who are aggrieved solely by the introduction of damaging evidence.'" United States v. Maxwell, 778 F.3d 719, 732 (8th Cir. 2015) (quoting Alderman v. United States, 394 U.S. 165, 171-72 (1969)).

However, when law enforcement conducts a traffic stop, any passenger in the vehicle, as well as the driver, is seized for Fourth Amendment purposes and may challenge the stop's constitutionality. See Brendlin v. California, 551 U.S. 249, 255-63 (2007). And a passenger may challenge a subsequent search of the vehicle "if he was unreasonably seized during the traffic stop and the seizure caused an unlawful search." Davis, 943 F.3d at 1132.

The defendants challenge the validity of the stop at issue in this case in two ways. First, they challenge the constitutionality of the initial stop based on an alleged traffic violation. Second, they challenge the permissibility of the extension of the stop beyond its initial purpose. All three defendants have standing to challenge the lawfulness of the initial traffic stop and its extension because they were all seized during the stop and the extension of the stop. See Brendlin, 551 U.S. at 255-63. However, the court, as discussed *infra* in sections II and IV, ultimately finds the initial traffic stop and the extension of the stop were permissible. The court also finds the vehicle search was constitutional. See infra section III. Joe and Nathan have not produced any facts which would support that they had a property or possessory interest in the vehicle. Therefore, they were not unreasonably seized during the course of

the stop or the search of the Silverado, nor did their seizure cause any unlawful search of the Silverado.  They do not have standing to challenge the search of the Silverado.  Ms. Guardado, who clearly had a possessory interest in the vehicle as both the driver of the vehicle at the time it was stopped and the individual on the rental agreement, and who joined in the motion to suppress, filed her own objections to the R&R and joined in the objections filed by her co-defendants.  She is the only defendant who has standing to challenge the search.  Finding at least one defendant has standing to challenge the validity of the traffic stop, the validity of the vehicle search and the permissibility of the extension of the stop, the court discusses each issue in turn.

## II.    Validity of Initial Traffic Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.  Whren v. United States, 517 U.S. 806, 809-10 (1996).  In order not to run afoul of the Fourth Amendment, a traffic stop must therefore "be supported by probable cause or reasonable suspicion." United States v. Gordon, 741 F.3d 872, 876 (8th Cir. 2013).

Probable cause to conduct a traffic stop exists when an officer has an objectively reasonable basis to believe the driver has committed a traffic violation.  Id. at 876.  "Any traffic violation, however minor, provides probable cause for a traffic stop."  United States v. Adler, 590 F.3d 581, 583 (8th Cir. 2009) (internal quotation omitted).  "This is true even if a valid traffic stop is a pretext for other investigation."  United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted).  Where, as in this case, the court must determine whether a traffic violation occurred from testimony of the officer or officers involved, a "credibility finding made by a magistrate judge 'after a hearing on the merits of a motion to suppress is virtually unassailable.'"  United States v. Shafer, 608 F.3d 1056, 1065 (8th Cir. 2010) (quoting United States v. Starr, 533 F.3d 985, 995 (8th Cir. 2008) (quoting United States v. Frencher, 503 F.3d 701, 701 (8th Cir. 2007))).

Although there was much testimony at the August 5, 2021, evidentiary hearing concerning the appearance of the Silverado and the defendants' behavior and appearance as the Silverado approached and ultimately passed the troopers, Trooper Hansen testified he pulled the Silverado over for speeding.  He testified the Silverado was traveling 70 miles per hour when he turned on his radar and that he locked the Silverado's speed in at 69 miles per hour as he pulled behind it.  When he checked one last time before effectuating the stop, his radar showed the Silverado was traveling at 68 miles per hour.  The posted speed limit was 65 miles per hour.  The magistrate judge found

Trooper Hansen's testimony regarding the Silverado's speed credible.  No other evidence was presented that directly corroborates or contradicts Trooper Hansen's testimony regarding the Silverado's speed at the time he effectuated the traffic stop.  The validity of the traffic stop turns on the credibility of Trooper Hansen's testimony in this regard.  The magistrate judge's finding Trooper Hansen testified credibly on this point is "virtually unassailable," and the court has no reason to question her finding.  <u>Shafer</u>, 608 F.3d at 1065 (quoting <u>Starr</u>, 533 F.3d at 995).

The court finds Trooper Hansen's testimony that the Silverado's driver committed a traffic violation credible.  The commission of any traffic violation provided probable cause for Trooper Hansen to conduct the initial stop of the Silverado.  Therefore, the court finds the initial traffic stop was valid.

### III.    Validity of Vehicle Search

The warrantless search of a vehicle is permissible where there is probable cause to believe the vehicle contains evidence of illegal activity.  <u>See</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  Probable cause exists when, "given the totality of the circumstances, a reasonable person could believe that there is a fair probability that contraband or evidence of a crime would be found" in the vehicle.  <u>Kleinholz v. United States</u>, 339 F.3d 674, 676 (8th Cir. 2003) (quoting <u>United States v. Fladten</u>, 230 F.3d 1083, 1085 (8th Cir. 2000)).  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object

of the search." <u>United States v. Ross</u>, 456 U.S. 798, 825 (1982). "The discovery of . . . marijuana provide[s] probable cause to search the entire vehicle," including "every part of the vehicle that might contain contraband . . . , because drug traffickers are known to stow contraband in secret compartments." <u>United States v. McCarty</u>, 612 F.3d 1020, 1026 (8th Cir. 2010) (finding search of gas tank for drugs permissible where there was evidence gas tank had been tampered with).

Much testimony by the troopers at the evidentiary hearing centered around their observations of the three defendants' behavior and of characteristics of the vehicle that, together, gave rise to the troopers' belief the defendants were smuggling drugs in the Silverado. For example, as the Silverado approached the troopers on the side of the road, Ms. Guardado and Nathan stared straight ahead and did not look over at the three patrol cars, which the troopers found suspicious. Throughout their interactions with the three defendants during the course of the stop, the defendants appeared nervous to the troopers, and their nervousness did not subside even after learning Ms. Guardado was merely going to receive a warning for speeding. The defendants also gave inconsistent stories when questioned separately by the troopers about why and for how long they were traveling to South Dakota. Furthermore, the vehicle was a rental from California, which officers frequently encounter as a supply state for illegal drugs that ultimately end up in South Dakota. The vehicle's exterior was also notably clean, which the officers found

odd for a vehicle that had traveled such a long distance in the wintertime and through a storm.  The Silverado's exterior appearance also contrasted with the appearance of its interior, which had a lived-in look and was quite messy.  The officers did not see the amount or type of luggage inside the vehicle that they would have expected three individuals to be carrying for the length and type of trip the defendants described, especially a trip taken during the coldest season of the year.  Collectively these facts heightened the troopers' suspicions that the defendants were smuggling drugs in the Silverado.

After Joe turned over marijuana to the troopers mere minutes into the stop, all of the troopers' observations up to that point, combined with the actual presence of illegal drugs in the vehicle—even if only a small amount— were a sufficient basis for a reasonable person to believe there was a fair probability additional illegal drugs would be found in the Silverado.  The totality of the circumstances established probable cause for the troopers to search the Silverado, including any area or compartment that could contain drugs.  See Kleinholz, 339 F.3d at 676; McCarty, 612 F.3d at 1026.  Additional observations made by the troopers as they began their search, including unusual tool marks on the underside of the vehicle, aftermarket screws in the truck bed liner, and unusual dirt patterns and fingerprints on the gas tank, suggested the gas tank had been tampered with.  These observations supported the troopers' probable cause to search even the most obscure

compartments of the vehicle for drugs, including the gas tank.  The court finds the search of the Silverado was supported by probable cause and was valid.

## IV.    Whether the Traffic Stop was Impermissibly Extended

"After a valid traffic stop, an 'officer may detain the [vehicle's driver and any passengers] while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." United States v. Hernandez-Mendoza, 600 F.3d 971, 975 (8th Cir. 2010).  However, an officer "may not extend a traffic stop longer than 'the time needed to handle the matter for which the stop was made' unless [they develop] reasonable suspicion" other criminal activity is afoot.  United States v. Pacheco, 996 F.3d 508, 511 (8th Cir. 2021) (quoting Rodriguez v. United States, 575 U.S. 348 (2015)).  During the time needed to handle the matter for which the stop was made, officers may engage in "certain unrelated" inquiries or investigations, "'so long as [those] inquiries [or investigations] do not measurably extend the duration of the stop.'" Rodriguez, 575 U.S. at 354-55 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)).

"Reasonable suspicion requires an officer to have 'a particularized and objective basis for suspecting legal wrongdoing based upon his own experience and specialized training.'" Pacheco, 996 F.3d at 511 (quoting United States v. Jones, 606 F.3d 964, 965-66 (8th Cir. 2010)).  If the officer thereafter "develops probable cause that contraband may be found in the vehicle, then it is reasonable for the officer to search the vehicle without a warrant." Hernandez-

Mendoza, 600 F.3d at 975.  Thereafter, probable cause "does not dissipate simply because it takes a long time to complete a reasonable and thorough search."  Id.; see also United States v. Olivera-Mendez, 484 F.3d 505, 512-13 (8th Cir. 2007) (finding a six-hour long vehicle search for drugs permissible).

As discussed in section II, the troopers testified at the evidentiary hearing about their observations of the defendants' behavior and the appearance of the Silverado, which taken altogether, elevated their belief the vehicle was carrying illegal drugs.  These are all factors the Eighth Circuit has found in previous cases are relevant to the reasonable suspicion calculus.  See, e.g., Pacheco, 996 F.3d at 512-13 (collecting cases).  Additionally, as discussed in section III, having recovered marijuana from the vehicle, the troopers established probable cause to believe the vehicle was carrying additional illegal drugs and to search the vehicle, including any and all areas and compartments within it that could contain drugs.  The troopers' reasonable suspicion the defendants were transporting illegal drugs and probable cause to search the Silverado for illegal drugs arose mere minutes into the stop and, most importantly, before Trooper Hansen timely completed the process of issuing Ms. Guardado a warning ticket for speeding.  The fact Joe apparently turned over the marijuana he had in the vehicle voluntarily at the request or suggestion of one of the troopers is of no consequence because the troopers' unrelated inquiries about drugs occurred prior to Ms. Guardado receiving a

speeding ticket and, therefore, those limited inquiries did not extend the duration of the stop.  See Rodriguez, 575 U.S. at 354-55.

The court finds the troopers established a reasonable suspicion criminal activity was afoot, and also had probable cause to believe the vehicle was carrying illegal drugs.  These circumstances were in place before the purpose of the initial traffic stop was accomplished.  The troopers permissibly extended the stop beyond its initial purpose in order to search the Silverado for drugs. Their probable cause to search the vehicle, including any compartments within it that were capable of carrying illegal drugs, did not dissipate over the roughly six hours it took them to remove the truck bed, sending unit and fuel tank.

## CONCLUSION

Based on the discussion above, the court overrules the defendants' objections, adopts the R&R and denies the motion to suppress.

## ORDER

Therefore, it is

ORDERED that defendants' objections to the report and recommendation (Dockets 99, 100 & 101) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 98) is adopted.

IT IS FURTHER ORDERED that defendants Erika Guardado's and Nathan Mendez's motions to join in the motion to suppress (Dockets 70 & 72)

are granted.  Their motions to join in the October 8, 2021, memorandum in
support of the motion to suppress (Dockets 95 & 96) are also granted.

IT IS FURTHER ORDERED that the motion to suppress (Docket 68) is
denied.

IT IS FURTHER ORDERED that a scheduling order shall issue.

Dated April 20, 2022.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE